## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: HAIR RELAXER SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 3060<br><br>Master Docket Case No. 1:23-cv-00818<br><br>Honorable Mary M. Rowland<br>_____ |
| **VERONICA CRUTCHER and REYNARD CRUTCHER**,<br><br>       **Plaintiffs**,<br><br> **vs.**<br><br>**L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC., SOFT-SHEEN CARSON, LLC, SOFT SHEEN\* CARSON (W.I.), INC., SOFT SHEEN/CARSON, INC., GODREJ SON HOLDINGS, INC., STRENGTH OF NATURE, LLC, DABUR INTERNATIONAL LTD., DABUR USA INC., and NAMASTE LABORATORIES, LLC,**<br><br>     **Defendants**. | **COMPLAINT AND JURY DEMAND**<br><br>Civil Action No.: _____ |

## <u>COMPLAINT</u>

Plaintiffs file this Complaint pursuant to CMO No. 2, and are to be bound by the rights,

protections and privileges, and obligations of that CMO and other Orders of the Court. Further,

in accordance with CMO No. 2, Plaintiffs hereby designate the United States District Court for

the Eastern District of Michigan as plaintiff's designated venue ("Original Venue"). Plaintiff

makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

**X** Plaintiff currently resides in Macomb County, Michigan;

**X** Plaintiff purchased and used Defendant(s)' products in Michigan;

___ The Original Venue is a judicial district in which Defendant _____ resides, and all defendants are residents of the State in which the district is located (28 USC 1391(b)(1)).

**X** The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC 1391(b)(2)): Plaintiff's purchases and use of hair relaxers occurred in Michigan. Plaintiff's cancer diagnosis occurred in Michigan.

___ There is no district in which an action may otherwise be brought under 28 USC 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC 1391(b)(3)).

____ Other reason (please explain): _____.

Plaintiffs VERONICA CRUTCHER and REYNARD CRUTCHER, by the undersigned counsel, make the following Complaint ("Complaint") against Defendants L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC., SOFT-SHEEN CARSON, LLC, SOFT SHEEN* CARSON (W.I.), INC., SOFT SHEEN/CARSON, INC., GODREJ SON HOLDINGS, INC., STRENGTH OF NATURE, LLC, DABUR INTERNATIONAL LTD., DABUR USA INC., and NAMASTE LABORATORIES, LLC, (collectively, "Defendants), alleging as follows:

## NATURE OF THE ACTION

1.     This action arises out of Plaintiff VERONICA CRUTCHER'S diagnosis of ovarian and endometrial cancer. Plaintiff VERONICA CRUTCHER'S ovarian and endometrial

cancer was directly and proximately caused by her regular and prolonged exposure to phthalates and other endocrine disrupting chemicals found in Defendants' hair care products.

2.    Plaintiffs VERONICA CRUTCHER and REYNARD CRUTCHER bring this action against Defendants for claims arising from the direct and proximate result of Defendants, their directors, agents, heirs and assigns, and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products known as include Dark & Lovely, Optimum, Organic Root Stimulator Olive Oil, Organic Root Stimulator Olive Oil Crème, Motions, Soft and Beautiful, Soft Sheen, and TCB Naturals (together, the "Products").

## I.    PARTIES

3.    Plaintiffs VERONICA CRUTCHER and REYNARD CRUTCHER are, and at all times relevant to this action were, citizens and residents of the State of Michigan with their place of residence being Macomb County, Michigan.

4.    Plaintiff VERONICA CRUTCHER was born on May 28, 1973.

5.    Plaintiff VERONICA CRUTCHER first began using Defendants' Products in or around 1988, and frequently used Defendants' Products until 2022.

6.    Plaintiff VERONICA CRUTCHER used Defendants' Products by applying them to her scalp and/or by having a professional at a hair salon apply Defendants' products, exactly as instructed by Defendants.

7.    There was never any indication on Defendants' Product packaging or otherwise that this normal use could and would cause her to develop ovarian and endometrial cancer.

8.      Defendant L'ORÉAL USA, INC. is, and at all times relevant to this action was, incorporated in the State of Delaware with its principal place of business and headquarters located at 10 Hudson Yards, New York, NY 10001, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. L'ORÉAL USA, INC. is a wholly owned subsidiary of L'ORÉAL S.A., a global corporation, which at all times relevant to this action was a French corporation having its headquarters and principal place of business in France.

9.      Defendant L'ORÉAL USA PRODUCTS, INC. is, and at all times relevant to this action was, incorporated in the State of Delaware with its principal place of business and headquarters located at 10 Hudson Yards, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. L'ORÉAL USA PRODUCTS, INC. is a wholly owned subsidiary of L'ORÉAL USA, INC.

10.      Defendant SOFT SHEEN-CARSON, LLC is, and at all times relevant to this action was, a limited liability company organized in the State of New York with its principal place of business and headquarters located at 80 State Street, Albany, New York 12207 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. Plaintiff alleges that, at all times relevant to this action, SOFT SHEEN-CARSON, LLC's sole members and sole interested parties are Defendant L'ORÉAL USA, INC., incorporated in Delaware with its principal place of business and headquarters at 10 Hudson Yards, New York, New York 100001. This Court has jurisdiction over SOFT SHEEN-CARSON, LLC based on complete diversity of citizenship between Plaintiff and each member of SOFT SHEEN-CARSON, LLC and Defendants collectively.

4

11.     SOFT SHEEN* CARSON (W.I.), INC. is a Delaware corporation and process may be served upon its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  SOFT SHEEN* CARSON (W.I.), INC. is a wholly owned subsidiary of Defendant L'ORÉAL USA, INC.

12.     SOFT SHEEN/CARSON, INC. is a Delaware corporation and process may be served upon its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Soft Sheen/Carson, Inc. is a wholly owned subsidiary of Defendant L'ORÉAL USA, INC.

13.     Defendant GODREJ SON HOLDINGS, INC. is, and at all times relevant to this action was, incorporated in the State of Georgia, with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon Karan Sood, 64 Ross Road, Savannah, Georgia 31405. GODREJ CONSUMER PRODUCTS LTD., a global corporation with its principal place of business in India, owns 100% of Defendant GODREJ SON HOLDINGS, INC.'s stock.

14.     Defendant STRENGTH OF NATURE, LLC (f/k/a STRENGTH OF NATURE GLOBAL, LLC) is, and at all times relevant to this action was, a limited liability company organized in the State of Georgia, with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon its registered agent, Karan Sood, 64 Ross Road, Savannah, Georgia 31405. Plaintiff alleges that, at all times relevant to this action, STRENGTH OF NATURE, LLC's sole member and interested party is and was GODREJ SON HOLDINGS, INC., incorporated in the State of Georgia, with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405. Process may be served upon Karan Sood, 64 Ross Road, Savannah, Georgia 31405. This Court has jurisdiction

over STRENGTH OF NATURE, LLC based on complete diversity of citizenship between Plaintiff and each member of STRENGTH OF NATURE, LLC and Defendants collectively.

15.    Defendant DABUR USA INC., is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 5 Independence Way, Princeton, New Jersey 08540.

16.    Defendant DABUR INTERNATIONAL LTD. is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 5 Independence Way, Princeton, New Jersey 08540.

17.    Defendant NAMASTE LABORATORIES, LLC (previously URBAN LABS, LLC) is, and at all times relevant to this action, a limited liability company organized in Illinois with its principal place of business located at 310 South Racine Avenue, Chicago, Illinois 60607, and process may be served upon its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703. Plaintiff alleges in good faith, at all times relevant to this action, NAMASTE LABORATORIES, LLC's member and sole interested party is, and at all times relevant to this action, was DERMOVIVA SKIN ESSENTIALS, INC., incorporated in Delaware having its headquarters and principal place of business at 310 South Racine Avenue, Chicago, Illinois 60607.  More than 99% of DERMOVIVA SKIN ESSENTIALS, INC. shares are owned by DABUR INTERNATIONAL LTD., with the rest, less than 1%, owned by DABUR INDIA LTD., a global corporation headquartered in Ghaziabad, India. According to DABUR USA's company website, the company has purchased 100% equity in NAMASTE LABORATORIES, LLC and its three subsidiary companies – HAIR REJUVENATION & REVITALIZATION NIGERIA LTD., HEARING HAIR

6

LABORATORIES INTERNATIONAL, LLC, and URBAN LABORATORIES INTERNATIONAL, LLC.

18.    No Defendant in this action is incorporated in the State of Michigan, maintains a principal place of business in the State of Michigan, or has members who are citizens of the State of Michigan. As Plaintiffs VERONICA CRUTCHER and REYNARD CRUTCHER are citizens of the State of Michigan, complete diversity exists in this action.

19.    At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the Products, and introduced the Products into interstate commerce with knowledge and intent that such products be sold in the State of Illinois.

20.    At all times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products, including but not limited to:

      **a.**  Dark & Lovely

      **b.**  Optimum

      **c.**  Organic Root Stimulator Olive Oil

      **d.**  Organic Root Stimulator Olive Oil Crème

      **e.**  Motions

      **f.**  Soft and Beautiful

      **g.**  Soft Sheen

      **h.**  TCB Naturals

21.    Defendants' defective Products were placed into the stream of interstate commerce and were purchased and used by Plaintiff.

22.     Plaintiff VERONICA CRUTCHER was diagnosed with both ovarian and endometrial cancer, conditions caused by Plaintiff's exposure to chemicals in the Defendants' Products.

## II.     JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

24.     This Court has personal jurisdiction over Defendants because Defendants conduct business in Illinois, purposefully direct and/or directed their actions toward Illinois, consented to being sued in Illinois by registering an agent for service of process in Illinois, consensually submitted to the jurisdiction of Illinois when obtaining a manufacturer or distributor license, and/or have the requisite minimum contacts with Illinois necessary to constitutionally permit this Court to exercise jurisdiction. Moreover, Defendants' actions and/or inactions described herein were purposefully directed at and/or within the State of Illinois, the damages were sustained by Plaintiffs within the State of Illinois, and the damages sustained by Plaintiffs were a result of Defendants' actions and/or inactions—described herein—that were purposefully directed at and/or within the State of Illinois. At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of Illinois.

25.     Venue is proper in this multidistrict litigation for one or more of the following reasons: (1) venue is proper in the transferor court in each constituent case; and/or (2) venue is proper in this District for pretrial purposes pursuant to 28 U.S.C. § 1407 and the February 6, 2023, Transfer Order of the Judicial Panel on Multidistrict Litigation and CMO No. 2.

### III.   FACTS COMMON TO ALL COUNTS

**A.  Hair Straighteners and Relaxers**

**a.  Market for Hair Straightening and Relaxing Products**

26.     Black people make up about 13 percent of the U.S. population, but by one estimate, Black spending accounts for as much as 22 percent of the $42 billion-a-year personal care products market, suggesting that they buy and use more of such products--including those with potentially harmful ingredients--than Americans as a whole.[1]

27.     In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, about one in twelve (12) was ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a free online resource for finding less-hazardous alternatives to personal care products. The worst-scoring products marketed to Black women were hair relaxers, and hair colors and bleaching products. Each of these categories had an average product score indicating high potential hazard.

28.     In the U.S. alone, Black consumers spend over $1 trillion each year, with a significant amount of that spending toward hair care products.

---

[1] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile*, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

29.     In 2020, the global Black Hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

###### b.  History of Hair Relaxers in America

30.     In its natural or virgin state, afro-hair texture is characterized by coily, springing, zigzag, and s-curve curl patters, as well as its density, fullness, texture, and feel.[2]

31.     Afro-textured hair "naturally grows up and out." [3]

32.     In Africa, hair was seen as a source of personal and spiritual power. As the highest point of the body and "most elevated part of the body, some communities believe[d] [their hair] connected them with the divine."[4] For some, hair was the "conduit for spiritual interaction with God." [5]

33.     African hairstyles were also status symbols reflecting one's "marital status, age, religion, and rank in society" and one's tribe. [6] Warriors, kings, and queens wore braids to show their ranking in society.[7] The Wolof tribe in West Africa, wore braided styles when they went to war.[8]

---

[2] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application*, 26, 14 (2018).

[3] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.

[4]  Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[5] Rumeana Jahangir, *How Does Black Hair Reflect Black History?*, BBC News. May 31, 2015. https://www.bbc.com/news/uk-england-merseyside-31438273.amp.

[6]  *History of Braids: More Than Just a Hairstyle*, Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.

[7] *Id*.

[8] *Id*.

34.     Most styling was extremely intricate and involved days of labor. Engaging in this process was considered to be necessary, as "only the mad and mourning did not do their hair." [9]

35.     One of the of first things slave masters did to enslaved people forced to American soil was cut their hair. This was a way to "break their spirit and make slaves easier to control."[10] What was once a symbol of pride and symbolism became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

36.     The very nature of slavery involved working long hours in dire conditions. Enslaved people had "no time to care about one's appearance or one's hair."[11] "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangles tresses and shield them from hours spent toiling under the sun."[12] The hair that was once an important spiritual and cultural symbol became tangled and matted.

37.     White Americans did not see African or Black hair as beautiful. Instead, they described it as "closer to sheep wool than human hair."[13] African hair that was once considered an attractive feature became a source of shame, to be covered or cut.

38.     In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law" requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were

---

[9] Hlonipha Mokoena, *From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair*, Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hair-myths-from-slavery-to-colonialism-school-rules-and-good-hair/.

[10] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[11] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[12]  *Id.*

[13] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html

members of the slave class, *even if they were free*.[14]"By requiring free Black women to wear the same hair covering, the governor was marking them as related to enslaved women rather than White women."[15] This law sent a direct signal to Black people that their hair held a symbol of inequality and was a sign of poverty regardless of their actual social status.

39.     Because afro-textured hair was kinky and reflected African heritage rather than European ancestry afro-textured hair was a symbol of low social status.[16]

40.     Slaves with lighter skin and less coily hair were favored to work in the home, a far less strenuous position than in the plantation fields. [17]

41.     Texturism, the idea that "good hair" is equated with a straighter hair texture, was cemented into American culture during its period of chattel slavery. "Eurocentric beauty standards dictated that coily hair and dark skin were unattractive and inferior"; "lighter skinned and straighter haired slaves were favored and selected for more desirable positions in the house" as opposed to the fields.[18] Thus, "the texture of an enslaved person's hair could determine their value and working conditions, which in turn might impact their overall health, comfort and chances for freedom[.]"[19] Naturally, Black men and women strived for a better life in the

---

[14]  Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb., 22, 2021, https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[15] *Fashionable Rebellion*, Women and the American Story, New York Historical Society Museum and Library, https://wams.nyhistory.org/settler-colonialism-and-revolution/settler-colonialism/fashionable-rebellion/.

[16] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[17] *Id.*

[18] *Id.*

[19] *Id.*

Americas and were taught that the straighter and less kinky their hair was, the better a life they could have. This fueled the desire for tools and products that could straighten Black hair texture.

42.     Gone were the days of African hairstyles and pride. "The goal of grooming the hair had morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted to Black kinks and curls."[20]

43.     In an effort to obtain a better life, so many slaves would go to "dangerous lengths to straighten their hair."[21]

44.     Black, or afro-textured hair, can be manipulated into a straightened state with the use of hair tools and hair products. Prior to the invention of the chemical relaxer in 1900s, individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to temporarily straighten them.[22]

45.     The hot comb was first invented by Frenchman, Marcel Grateau who popularized the hair styling tool in Europe in the 1870s, including advertisements in catalogs of major department stores like Sears and Bloomingdales.[23] The hot comb was later modified by Madam C.J. Walker, a trailblazer in the development of Black hair products, to be manufactured with

---

[20] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[21]  Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts

[22] Jaclyn Peterson, *The Price of Beauty*, CTI Charlotte Teachers Institute Curriculum (2021).

[23] Henry Louis Gates, *Madam Walker, the First Black American Woman to Be a Self-Made Millionaire*, PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-americans-many-rivers-to-cross/history/100-amazing-facts/madam-walker-the-first-black-american-woman-to-be-a-self-made-millionaire/ (last visited October 18, 2022).

wider comb teeth.[24] With Walker's system, once the comb was heated a softening ointment was then applied for easier manipulation of afro-textured hair.[25]

46.     Today, afro-textured hair is still often straightened with a hot comb rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly-kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration,[26] creating a shorter or fuller appearance.

---

[24] Cookie Lommel, Madam C.J. Walker 60 (1993)

[25] *Id*. at 62.

[26] *Id*.

14



### i. The Invention of the Chemical Relaxer

47.     African American inventor Garrett Augustus Morgan, discovered and created a system that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

48.     In additional to being an inventor, Morgan was a tailor. In the early 1900s, Morgan was repairing his sewing machines and creating a way to polish the needles to stitch fabrics more smoothly.[27] He applied a chemical solution to the needles and wiped the solution off with a rag

---

[27] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[28]

49.     Morgan further tested the chemical on a dog with curly hair and eventually on his own hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream that was marketed in 1913.





---

[28] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen 28 (2008).

50.     Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical-based permanent hair straightening products in the Black hair care market.[29]

### c. Defendants' Marketing Efforts

51.     In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[30]

52.     In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[31] As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.[32]

53.     Today, Defendants market their hair relaxer products to Black customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendant's marketing scheme relies heavily relying on branding and slogans that reinforce straight hair as the standard.[33]

54.     The STRENGTH OF NATURE and GODREJ Defendants market its Soft & Beautiful and Motions hair relaxer products depicting beautiful, happy, fair-skinned African American women with straight hair in seeming perpetual motion.[34]

---

[29] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

[30] Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017 https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*





55.     The STRENGTH OF NATURE and GODREJ Defendants also carry a TCB

Naturals line that promises "silky smooth relaxed hair."





56. The L'ORÉAL and SOFT SHEEN Defendants depict a Black woman with straight hair on their Optimum and Dark & Lovely brand of relaxer products.





57. The NAMASTE and DABUR Defendants also target Black woman with its Original Root Stimulator Olive Oil line.



### d. Chemical Relaxer Use

58.     Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

59.     Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States.

60.     Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage is to straighten and smooth the hair. After a period of weeks or months, depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots. Maintaining the relaxed hairstyle requires on-going application of hair relaxer to the new growth, a process

colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average.

61.     Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of ''lye'' relaxers is sodium hydroxide, while no-lye relaxers contain calcium hydroxide and guanidine carbonate, and ''thio'' relaxers contain thioglycolic acid salts. No-lye relaxers are advertised as causing fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

62.     In some studies, up to 90% of Black and Brown women have used hair relaxers and straighteners, which is more commonplace for these women than women of any other race. Hair relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" ingredient categories. Relaxer habits usually begin in formative childhood years; adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.[35]

63.     In the 1990s, the first relaxer product for young Black girls, Just for Me ™, hit the market with a catchy advertising jingle that captured consumer attention.[36] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps.

---

[35] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

[36] Dana Oliver, *The '90s Just For Me Hair Relaxer Commercials Song Is Stuck In Our Hea*ds, HuffPost, Feb. 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981

64.     Once relaxer use begins in childhood, it usually becomes a lifetime habit. The frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

65.     The reasons for Black women's use and dependence upon hair straightening products are associated with various factors, including (1) the post-slavery continuation of Eurocentric beauty norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair maintenance, and (5) culture.[37]

66.     In a culture where Black features have historically been deemed less attractive, the decision to begin and continue using products to alter the natural state of their hair serves as a protective mechanism against racial discrimination. In the Dove CROWN Research Study for Girls (2021)[38] conducted by JOY Collective, the following statistics was discovered:

a.  100% of Black elementary school girls in majority-White schools who report experiencing hair discrimination state they experience the discrimination by the age of 10.

b.  86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of 12.

c.  66% of Black girls in majority-White schools report experiencing hair discrimination compared to 45% of Black girls in all school environments.

---

[37] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred*, Applied Psychology Opus, https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/

[38] JOY Collective, *Dove CROWN Research Study for Girls* (2021), https://static1.squarespace.com/static/5edc69fd622c36173f56651f/t/623369f7477914438ee18c9 b/1647536634602/2021_DOVE_CROWN_girls_study.pdf

d. 53% of Black mothers, whose daughters have experienced hair discrimination, say their daughters experienced the discrimination as early as 5 years old.

e. 47% of Black mothers report having experienced discrimination related to their hair.

f. Trauma from these experiences cause girls to miss days from school; teenage Black girls are missing a week of school per year due to hair dissatisfaction.

g. While 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination she endures has an impact on how she sees herself.

h. Black women are one and a half times more likely to be sent home from the workplace because of their hair.

i. Black women are 89% more likely than White women to agree with the statement, "I have to change my hair from its natural state to fit in at the office."

67. The CROWN Act of 2021[39] is a legislative bill introduced in both houses of Congress to address discrimination against protective hair styles worn predominantly by women of color. While the bill did not pass the Senate in 2022, eighteen states have signed a version of the bill into state law.

### e. Regulatory Framework

68. The law does not require cosmetic products or ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that

---

[39] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based on race-based hairstyles by extending statutory protection to hair texture and protective styles such as braids, locks, twists, and knots in the workplace and public schools. https://www.thecrownact.com/

apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Act ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

69.     The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

70.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

71.     Under the FD&C Act a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user, and 2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

72.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.

73.     Under the FD&C Act, a cosmetic is misbranded if: 1) labeling is false or misleading, 2) the label does not include all required information, 3) required information is not prominent and conspicuous, 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[40]

74.     Under United States law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes

---

[40] Food and Drug Administration Cosmetic Act § 602 (1938).

the cosmetic harmful when used as intended.[41] An example of such an ingredient is methylene chloride because it causes cancer in animals and is likely to be harmful to human health, too.[42]

75.     On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously authorized phthalates to be used as food additives.[43] The FDA revoked authorizations for the food contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[44]

76.     Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients. Nor does the law require cosmetic companies to share their safety information with the FDA.

77.     The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through: (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic, and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[45]

---

[41] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics

[42] 21 Code of Federal Regulations § 700.19.

[43] § 87 FR 31080

[44] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications

[45] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration, Mar., 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated

78.     Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that: (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[46]

79.     With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states, "The label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the product." (emphasis added). This warning directive directly correlates with the broad authority and responsibility of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

80.     In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers anytime a health hazard may be associated with their products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color.

**B.  Endocrine-Disrupting Chemicals**

---

[46] *Id.*

81.     The endocrine system is indispensable for life and influences nearly every cell, organ, and process within the body.[47] The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as metabolism and blood sugar levels.[48]

82.     The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[49]

83.     Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.[50]

84.     When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[51]

85.     The precise functioning of the endocrine system is vital to maintaining hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[52]

---

[47] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

[48] *Endocrine Disruption*, United States Environmental Protection Agency, Mar. 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52]*Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov. 12, 2019,

27

86.    Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system.

87.    EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery.[53]

88.    EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

89.    EDCs can cause the body to operate as if there were a proliferation of a hormone, and thus over-respond to the stimulus or respond when it was not supposed to do so by mimicking a natural hormone.

90.    EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

91.    EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off, or altering the structure of target cells' receptors.[54]

92.    EDCs are known to cause to numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers,

---

https://www.nature.com/articles/s41574-019-0273-8

[53] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

[54] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub

altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological and learning disabilities.[55]

93. EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with breast cancer, and a woman's lifetime risk of developing the disease increases with greater duration and cumulative exposure.

94. Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

95. Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs, including Di-2-ethylhexylphthalate, have on the male and female reproductive systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[56]

### a. Phthalates

96. Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable.

---

[55] *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan. 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

[56] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates*, Dev Reproduction, Mar. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.

These colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses.

97.     Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate skin and hair.[57]

98.     Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations.

99.     At all relevant times herein, phthalates were used in Defendants' Products.

100.    Phthalates are known EDCs, which interfere with natural hormone production and degradation and are detrimental to human health.[58]

101.    Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after product is applied, among other uses.

102.    Phthalates can be found in most products that have contact with plastics during producing, packaging, or delivering. Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[59]

---

[57] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates

[58] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[59] *Id.*

103.   Phthalates are a series of chemical substances, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects. Phthalates can potentially disrupt the endocrine system.[60]

104.   Defendants' Products contain phthalates, including Di-2-ethylhexylphthalate.

105.   Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

106.   However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients; phthalates evade listing when combined with a fragrance. As a result, consumers, including Plaintiff, have not been able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products that Defendants placed into the stream of commerce.

107.   Since 1999, the Centers for Disease Control ("CDC") have found phthalates in individuals studied for chemical exposure.[61]

### i.   Di-2-ethylhexylphthalate

108.   Di-2-ethylhexylphthalate[62] ("DEHP") is a highly toxic manufactured chemical[63] that is not found naturally in the environment.[64]

---

[60] *Id.*

[61] *Biomarker Groups*, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf

[62] Also known as Bis(2-ethylhexyl) phthalate.

[63] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed Research International, Feb. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites.

[64] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as

109.    DEHP belongs to the family of chemicals called phthalates.[65]

110.    DEHP was first used in 1949 in United States and has been the most abundantly used phthalate derivative in the twentieth century.[66]

111.    DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure.[67]

112.    Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure for their lifetimes, including intrauterine life.[68]

113.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3–30 μg/kg/day.[69]

114.    The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day, and the tolerate daily intake (TDI) is 48 μg/kg bodyweight.[70]

---

hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).

[65]    *Di(2-ethylhexyl)    phthalate    (DEHP)*,    Proposition 65,    California.    Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp

[66]    Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234

[67]    Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health    Care,    Science    Direct,    May    2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub

[68]    Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/

[69]    Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume    90,    Issue    6,    June    2014,    136,    1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

[70]    Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
| --- | --- | --- | --- | --- |
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[71]

115.    When DEHP enters in the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites, which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[72]

116.    DEHP and its metabolites are known to cause significant adverse-health effects including, but not limited to: endometriosis, developmental abnormalities, reproductive dysfunction and infertility,[73] various cancers, and metabolic syndrome within the human population and their future children.[74]

---

(Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[71] Aalekhya Reddam & David Volz, *Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk*, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X

[72] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept. 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

[73] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice,* Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/

[74] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

117.    Most of the available studies on the health effects of DEHP in laboratory animals used oral administration, with a few inhalation studies and only two dermal exposure studies identified.[75]

118.    The results of the selected animal studies, along with limited human data, suggest potential associations between DEHP exposure and the following health outcomes:

a) **Reproductive effects.** Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

b) **Developmental effects.** Epidemiological studies suggest a potential association between reduced anogenital distance and testicular decent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies in animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

119.    The global consumption of DEHP was estimated at 3.07 million tons, while global demand for plasticizers continues to rise. The estimated global market of phthalates in 2020 is expected to reach 10 billion USD and would still be widely used in plasticizers.[76]

120.    Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[77]

---

[75] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf

[76] *Id*.

[77] *Id*.

121.    Evidence found that DEHP was significantly related to insulin resistance, higher systolic blood pressure, and reproductive system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[78]

122.    Regarding impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[79]

123.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the United States Congress passed the Consumer Protection Safety Act (CPSA), which permanently banned children's toys and childcare articles containing DEHP, DBP, and BBP at levels >0.1% by weight.[80]

### b. Formaldehyde

124.    Formaldehyde has been classified as a known human carcinogen by both the U.S. Department of Health and Human Services' National Toxicology Program ("NTP") and the IARC.[81]

125.    Specifically, in 2005, IARC published its conclusions regarding formaldehyde: "After a thorough discussion of the epidemiologic, experimental, and other relevant data, the

---

[78] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w

[79] *Id*.

[80] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

[81] Pierce J.S., et al. Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair Straightening Products. J. Occ. and Environ. Hygiene 2011;8:686-699.

working group concluded that formaldehyde is carcinogenic to humans, based on sufficient evidence in humans and in experimental animals."[82]

126.    Ingredients, including formaldehyde and formaldehyde-releasing chemicals found in chemical hair relaxers and straighteners have played a role in carcinogenesis, "supporting an association between hair product use and cancer development."[83]

127.    Hair straightening and relaxing products have been found to contain a range of endocrine disrupting chemicals, including phthalates and parabens, in addition to formaldehyde.[84]

128.    Formaldehyde is a common ingredient in chemical hair relaxers and straighteners, even in those labeled as "formaldehyde-free," released into the air when the product is heated during application.[85]

### C. Injuries Associated with Exposure to Endocrine Disrupting Chemicals

#### a. Uterine Cancer

129.    Uterine cancer is associated with phthalate metabolites found in hair care products.

---

[82] Cogliano V.J., et al. Meeting Report: Summary of IARC Monographs on Formaldehyde, 2-Butoxyethanol, and 1-tert-Butoxy-2Propanol. Environ. Health Perspect. 2005;113:1205–1208. doi:10.1289/ehp.7542 available via http://dx.doi.org/.

[83] Chang C.J., et al. Use of Straighteners and Other Hair Products and Incident Uterine Cancer. JNCIL Natl. Cancer Inst. 2022; 114:12,1636-1645. https://doi.org/10.1093/jnci/djac165.

[84] White  A.J., et al. Use of Hair Products in Relation to Ovarian Cancer Risk. Carcinogenesis. 2021;42:1189-1195. https://doi.org/10.1093/carcin/bgab056.; *see also* Aglan M.A., et al. Hair Straightening Products and the Risk of Occupational Formaldehyde Exposure in Hairstylists. Drug and Chemical Toxicology 2020;43:5,488-495. DOI: 10.1080/01480545.2018.1508215

[85] Pierce J.S., et al. Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair Straightening Products. J. Occ. and Environ. Hygiene 2011;8:686-699.

130.    Uterine cancer[86] is among the more common (the fourth most common) cancers in women in developed countries,[87] accounting for about 3% of all new cancer cases.[88]

131.    Every year around 65,000 females develop uterine cancer in the US alone, out of which more than 90% is of endometrial origin. It is commonly diagnosed in the seventh decade, with the mean age being 61 years.[89]

132.    The incidence in Black women is twice that of White women.[90] In addition, Black women with uterine cancer carry a poorer prognosis as compared to White women.[91]

133.    Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[92]

134.    Indeed, new cases of uterine cancer have increased by 0.6 percent per year from 2010 to 2019, and death rates have risen an average of 1.7 percent per year during the same time frame.[93]

---

[86] Otherwise known as endometrial carcinoma.

[87] Unaiza Faizan & Vijayadershan Muppidi, *Uterine Cancer*, In: StatPearls, National Library of Medicine, Jan. 2022, https://www.ncbi.nlm.nih.gov/books/NBK562313/

[88] *Cancer Stat Facts: Uterine Cancer*, National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html

[89] *Id.*

[90] *Id.*

[91] Joel Sorosky, *Endometrial Cancer*, Obstetrics & Gynecology Volume 120, 383-97, Aug. 2012, https://pubmed.ncbi.nlm.nih.gov/22825101/

[92] Linda Duska, et al., *Treatment of Older Women With Endometrial Cancer: Improving Outcomes With Personalized Care*, American Society Clinical Oncology Educational Book, 35:164-74, 2016, https://pubmed.ncbi.nlm.nih.gov/27249697/

[93] Jack J. Lee, *Rising Endometrial Cancer Rate Spur New Approaches to Prevention*, National Cancer Institute: Division of Cancer Prevention, June 28, 2022, https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer

135.    A groundbreaking study recently found that women who use chemical hair straightening, or relaxing products have a higher risk contracting of uterine cancer.[94]

136.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of 70; but for frequent users, that risk more than doubles, increasing to 4.05%.[95]

137.    These risks are more substantial among Black women, who make up the overwhelming majority of hair straightening and hair relaxing products, including Defendants' products.

### b.  Ovarian Cancer

138.    It is estimated that 19,880 women in the United States will be diagnosed with ovarian cancer in 2022, with an estimated 12, 810 of those diagnoses resulting in death.[96]

139.    Ovarian cancer ranks fifth in cancer deaths amongst women, resulting in more deaths than any other cancer of the female reproductive system.[97]

140.    Ovarian cancer is hypothesized to have a hormonally driven etiology, meaning that the insertion of hormonal disrupting compounds and the subsequent disruption of a woman's hormonal balance could lead to ovarian cancer.[98]

---

[94] Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, Journal of the National Cancer Institute, Oct. 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/

[95] *Id.*

[96] *Cancer Stat Facts: Ovarian Cancer*, National Cancer Institute, https://seer.cancer.gov/statfacts/html/ovary.html

[97] *Key Statistics for Ovarian Cancer*, American Cancer Society, https://www.cancer.org/cancer/ovarian-cancer/about/key-statistics.html#:~:text=Ovarian%20cancer%20ranks%20fifth%20in,is%20about%201%20in%20108.

[98] White, Alexandra J., et al., *Use of Hair Products in Relation to Ovarian Cancer Risk*,

38

141.    Products that are used to straighten or relax hair texture have been found to contain an array of endocrine disrupting compounds including, but not limited to, phthalates, parabens, cyclosiloxanes, and metals, in addition to formaldehyde.[99]

142.    Recent studies have supported an association between personal hair care products, including products that contain endocrine disrupting compounds, and ovarian cancer.[100]

143.    Widely used chemical hair products, such as hair relaxers and straighteners, are a source of exposure to carcinogens and these endocrine disrupters alike.[101]

144.    Chemical hair straighteners and relaxers are predominately used by Black and Brown women, who make up the overwhelming majority of consumers of these products: recent scientific studies have observed a 15-20% higher risk of ovarian cancer associated with using permanent hair dye more than 100 times.[102]

145.    Other studies have found a positive correlation between the use of straighteners and incidents of ovarian cancer. Self-reported frequent use of hair straighteners has been associated with a higher risk of ovarian cancer.[103]

146.    The risk of ovarian cancer, posed by the use and distribution of these chemical hair relaxers and straighteners, is far more substantial to the overwhelming majority of consumers of these products, African American women.

**D. Plaintiff's Use of Hair Relaxing Products**

---

Carcinogeneisi Vol. 42, No. 9, 1189-1195, 1189 (2021).

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.* at 1192

147.     Plaintiff VERONICA CRUTCHER was first exposed to EDCs, formaldehyde, and/or phthalate-based products around 1988 when she began using Defendants' products.

148.     Plaintiff VERONICA CRUTCHER used Defendants' products by applying them to her scalp and at times by having a professional at a hair salon apply Defendants' products exactly as instructed by Defendants.

149.     Plaintiff VERONICA CRUTCHER continued using Defendants' products from around 1988 until approximately 2022.

150.     Plaintiff VERONICA CRUTCHER kept the Product on her hair for the time allotted in the instructions.

151.     There was never any indication, on the Products packaging or otherwise, that this normal use could and would cause her to develop uterine/endometrial cancer.

152.     Plaintiff VERONICA CRUTCHER was first diagnosed with ovarian and endometrial cancer on or around May 19, 2020 at the age of 46.

153.     Plaintiff VERONICA CRUTCHER has completed numerous cycles of adjuvant chemotherapy including Taxol, Carboplatin, and Zirabev and undergone invasive procedures which have caused severe and excruciating pain, including a hysterectomy with bilateral removal of ovaries and fallopian tubes.

154.     Plaintiff VERONICA CRUTCHER has no family history of ovarian or endometrial cancer.

155.     Plaintiff VERONICA CRUTCHER has had difficulties over the years conceiving children and as a result she and Plaintiff REYANRD CRUTCHER have not been able to have any children of their own.

156.     Plaintiff VERONICA CRUTCHER'S injuries have had a significant impact on her quality of life and marriage with Plaintiff REYNARD CRUTCHER. Plaintiff VERONICA CRUTCHER is unable to work due to her painful symptoms and injuries.

157.     As a result of Defendants' acts and/or omissions, Plaintiff VERONICA CRUTCHER has suffered extreme pain and suffering and extreme emotional distress.

## COUNT ONE-STRICT LIABILITY
## (FAILURE TO WARN)

158.     Plaintiffs repeat and reallege the allegations in Paragraphs 1-157 above, as if fully set forth herein.

159.     At all pertinent times, the Defendants were manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

160.     At all pertinent times, Plaintiff used the Products on her scalp area, which is a reasonably foreseeable use.

161.     At all pertinent times, Defendants in this action knew or should have known that the use phthalates and other EDC's in hair products significantly increases the risk of cancer, including, but not limited to, uterine/endometrial cancer, based upon scientific knowledge dating back for decades.

162.     At all pertinent times, including the time of sale and consumption, the Products, when put to the aforementioned reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of cancer, including, but not limited to, uterine/endometrial cancer, associated with the use of the Defendant's hair products. Defendants themselves failed to properly and adequately warn and instruct Plaintiff as to the risks and benefits of the Products given her need for this information.

41

163.    Had Plaintiff received a warning that the use of the Products would significantly increase her risk of developing uterine/endometrial cancer, she would not have used them. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the Products, Plaintiff was injured catastrophically, and was caused severe pain, suffering, infertility, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

164.    The development of uterine cancer by Plaintiff was the direct and proximate result of the unreasonably dangerous and defective condition of the Products at the time of sale and consumption, including their lack of warnings; Plaintiff suffered injuries and damages including, but not limited to, physical and mental pain and suffering, infertility, and medical expenses.

165.    Defendants' Products were defective because they failed to contain warnings and/or instructions and breached express warranties and/or failed to conform to express factual representations upon which Plaintiff justifiably relied in electing to use the Products. The defect or defects made the Products unreasonably dangerous to persons, such as Plaintiff, who could reasonably be expected to use and rely upon such products. As a result, the defect or defects were a producing cause of Plaintiff's injuries and damages.

166.    Defendants' Products failed to contain, and continue to this day not to contain, adequate warnings and/or instructions regarding the increased risk of cancer with the use of their products by women. Defendants continue to market, advertise, and expressly represent to the general public that it is safe for women to use their product. These Defendants continue with these marketing and advertising campaigns despite having scientific knowledge that dates back to 2015 that their products increased the risk of cancer in women.

167.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT TWO – STRICT LIABILITY
## (DESIGN AND/OR MANUFACTURING DEFECT)

168.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-167 above, as if fully set forth herein.

169.    Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

170.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

171.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

172.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

173.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing uterine/endometrial cancer.

174.    The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, renders the

Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

175.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

176.    Defendants have known, or should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

177.    As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

### COUNT THREE – STRICT LIABILITY
### (DESIGN AND/OR MANUFACTURING DEFECT)

178.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-177 above, as if fully set forth herein.

179.    At all relevant times. Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

180.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

44

181.   The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

182.   Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

183.   Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing uterine/endometrial cancer.

184.   The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

185.   Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

186.   Defendants knew, or by the exercise of reasonable care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

187.   Defendants owed a duty to all reasonably foreseeable users to design a safe product.

45

188. Defendants breached their duty by failing to use reasonable care in the design and/or manufacturing of their Products because the Products were unreasonably dangerous in that they increase the risks of cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

189. Defendants also breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative deigns in the design and/or manufacturing of their Products.

190. A reasonable company under the same or similar circumstances would have designed a safer product.

191. As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

   a. Economic losses including medical care and lost earnings; and

   b. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

### COUNT FOUR-PRODUCTS LIABILITY
### (NEGLIGENT FAILURE TO WARN)

192. Plaintiffs repeat and reallege the allegations in Paragraphs 1-191 above, as if fully set forth herein.

193.    At all relevant times. Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

194.    Defendants knew, or by the exercise of reasonable care, should have known that use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

195.    Defendants knew, or by the exercise of reasonable care, should have known that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

196.    Defendants owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

197.    Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings on their Products, including that Products were likely to increase the risks of cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

198.    The failure of Defendants to adequately warn about their defective products, and their efforts to misleadingly advertise through conventional avenues, created a danger of injuries

47

described herein that were reasonably foreseeable at the time of design and/or manufacture and distribution.

199.     At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising.

200.     A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

201.     Plaintiff was injured as a direct and proximate result of Defendants' failure to warn and instruct because she would not have used the Products had she received adequate warnings and instructions that the Products could increase the risks of cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

202.     Defendants' lack of adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, was a substantial contributing factor in causing harm to Plaintiff.

203.     As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

   a.   Economic losses including medical care and lost earnings; and

   b.   Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT FIVE – NEGLIGENCE
### (DESIGN AND/OR MANUFACTURING DEFECT)

204.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-203 above, as if fully set forth herein.

205.    At all relevant times. Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

206.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

207.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

208.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

209.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing uterine/endometrial cancer.

210.    The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

211.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

49

212.  Defendants knew, or by the exercise of reasonably care should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

213.  Defendants owed a duty to all reasonably foreseeable users to design a safe product.

214.  Defendants breached their duty by failing to use reasonable care in the design and/or manufacturing of their Products because the Products were unreasonably dangerous in that they increase the risks of cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

215.  Defendants also breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative deigns in the design and/or manufacturing of their Products.

216.  A reasonable company under the same or similar circumstances would have designed a safer product.

217.  As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

     a.  Economic losses including medical care and lost earnings; and

b.   Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT SIX-NEGLIGENCE**
**(NEGLIGENCE AND/OR GROSS NEGLIGENCE)**

218.   Plaintiffs repeat and reallege the allegations in Paragraphs 1-217 above, as if fully set forth herein.

219.   The Defendants' negligence and extreme carelessness includes, but is not limited to, their marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing the Products in one or more of the following respects:

a.   In failing to warn Plaintiff of the hazards associated with the use of the Products;

b.   In failing to properly test their products to determine adequacy and effectiveness or safety measures, if any, prior to releasing the Products for consumer use;

c.   In failing to properly test their products to determine the increased risk of uterine/endometrial cancer during the normal and/or intended use of the Products;

d.   In failing to inform ultimate users, such as Plaintiff as to the safe and proper methods of handling and using the Products;

e.   In failing to remove the Products from the market when Defendants knew or should have known the Products were defective;

f.   In failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to the Products which caused increased risk of cancer, including, but not limited to, uterine/endometrial cancer;

g.   In failing to inform the public in general and Plaintiff in particular of the known dangers of using the Products;

51

h.     In failing to advise users how to prevent or reduce exposure that caused increased risk for cancer, including, but not limited to, uterine/endometrial cancer;

i.     In marketing and labeling the Products as safe for all uses despite knowledge to the contrary;

j.     In failing to act like a reasonably prudent company under similar circumstances. Each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiff.

220.   At all pertinent times, the Defendants knew or should have known that the Products were unreasonably dangerous and defective when put to their reasonably anticipated use.

221.   Defendants' acts and/or omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

222.   Defendants acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

223.   Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein.

224.   Defendants' negligence and/.or gross negligence were a substantial factor in causing and/or contributing to Plaintiff's harms.

225.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

a.   Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, and loss of enjoyment and impairment of quality of life, past and future.

## COUNT SEVEN-NEGLIGENCE
### (NEGLIGENT MISREPRESENTATION)

226. Plaintiffs repeat and reallege the allegations in Paragraphs 1-225 above, as if fully set forth herein.

227. Defendants had a duty to accurately and truthfully represent to consumers, Plaintiff, and the public, that the Products had been tested and found to be safe and effective for use. The representations made by Defendants, in fact, were false.

228. Defendants failed to exercise ordinary care in the representations concerning the Products while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the Products' high risk of unreasonable, dangerous, adverse side effects.

229. Defendants breached their duty in representing that the Products have no serious side effects.

230. As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the Products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that it created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, but not limited to, cancer.

231. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

a. Economic losses including medical care and lost earnings; and

53

b. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT EIGHT – VIOLATION OF MICHIGAN CONSUMER PROECTION ACT
### (MCL §§ 445.901 *et seq.*)

232.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-231 above, as if fully set forth herein.

233.    The Michigan Consumer Protection Act, MCL § 445.903, states that, "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful…"

234.    By the conduct described in detail above and incorporated herein, Defendant engaged in unfair or deceptive acts in violation of Michigan Consumer Protection Act.

235.    Plaintiff purchased and used Defendants' Products primarily for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the Michigan consumer protection laws.

236.    Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for Defendants' product, and would not have incurred related injuries and damages.

237.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, monetary gain from Plaintiff for the Products that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

238.    Defendants engaged in unfair methods of competition and deceptive acts or practices that were proscribed by law, including the following:

54

a. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

b. Advertising goods or services with the intent not to sell them as advertised; and

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

239. Defendants intended for Plaintiff to rely on their representations and advertisements regarding the Products in order to achieve monetary gain from Plaintiff through her purchase of the Products.

240. Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at Plaintiff and other consumers was to create demand for and sell the Products. Each aspect of Defendants' conduct combined to artificially create sales of the product.

241. Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

242. Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for the product, and would not have incurred related injuries and damages.

243. Defendants' intentional, deceptive, unconscionable, and fraudulent representations and material omissions to Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of Michigan Consumer Protection laws.

244. Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of Michigan Consumer Protection laws.

245. Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices, or have made false representations in violation of Michigan Consumer Protection laws.

246. Under these statutes, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

247. Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that Defendants' the Products were fit to be used for the purpose for which it was intended, when in fact it was defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

248. The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

249. Defendants had actual knowledge of the defective and dangerous condition of Defendants' product and failed to take any action to cure such defective and dangerous conditions.

250. Plaintiff relied upon Defendants' misrepresentations and omissions in determining which product to use.

251. Defendants' deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

252. By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiffs, suffered ascertainable losses and damages.

253. As a direct and proximate result of Defendants' violations of the State of Michigan's consumer protection laws, Plaintiff sustained the following damages:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT NINE-FRAUD

254. Plaintiffs repeat and reallege the allegations in Paragraphs 1-253 above, as if fully set forth herein.

255. Defendants, who engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding said products.

256. Defendants fraudulently misrepresented the use of the Products as safe and effective, specifically:

    a. The L'ORÉAL and SOFT SHEEN Defendants Dark & Lovely product is intentionally labeled as a "No Lye. No Mess." product having "jojoba and avocado oil," "protein," and "shea butter" which "helps preserve signs of healthy hair" and causes "moisture, strength, softness, shine, and body."

    b. The L'ORÉAL and SOFT SHEEN Defendants Optimum product is also intentionally labeled as a "No-Lye Relaxer" that "Def[ies] Breakage."

c. The STRENGHT OF NATURE and GODREJ Defendants market their Motions product as a safe relaxer with "85% less breakage" and causing silkening shine."

d. The STRENGHT OF NATURE and GODREJ Defendants Soft & Beautiful product is labeled as safe relaxer with "Triple Hydration Oils" "Olive, Argan & Coconut."

e. The STRENTGH OF NATURE and GODREJ Defendants also carry a TCB Naturals line that is "conditioning" with "argan oil, vitamin E, and Olive." According to the STRENGTH OF NATURE and GODREJ Defendants TCB combines "nature and science to help protect, strengthen and improve your hair's condition for silky smooth relaxed hair."

f. The NAMASTE and DABUR Defendants Original Root Stimulator Olive Oil products are marketed as "Olive Oil" products to imply natural products, and their Products are advertised as being "Built in Protection" resulting in "smooth and shine with the power of exotic oils."

g. Defendants NAMASTE and DABUR's website states that their Products use "Rich Olive and Avocado Oils" that they claim, "moisturize and condition while Aloe Vera protects the skin and scalp."

h. The NAMASTE and DABUR Defendants claim that their Products "use[] the latest technology to safely elongate tight coils."

257. Defendants knew that these misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive and deceitful when they were made.

258.    Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding consumers, including Plaintiff, with the intention of having them act and rely on such misrepresentations and/or omissions.

259.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

260.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

261.    Defendants' actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

262.    As a foreseeable, direct, and proximate result of the aforementioned fraudulent misrepresentations by Defendants, Plaintiff sustained the following damages:

    **a.**  Economic losses including medical care and lost earnings; and

    **b.**  Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT TEN – FRAUDULENT CONCEALMENT

263.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-262 above, as if fully set forth herein.

264.    Defendants owed consumers, including Plaintiff, a duty to fully and accurately disclose all material facts regarding the Products, not to conceal material defects related thereto, not to place these defective products into the stream of commerce, and to fully and accurately

label product packaging. To the contrary, Defendants explicitly and/or implicitly represented that the Products were safe and effective.

265.    Defendants actively and intentionally concealed and/or suppressed material facts, in whole or in part, to induce consumers, including Plaintiff, to purchase and use the Products and did so at her expense. Specifically:

        a.   Defendants have been aware of the positive association between DEHP used in their products and an increased risk of cancer demonstrated by epidemiology studies since at least 2015 that exposure to the phthalates in their products enhance invasive and proliferative activities of endometrial cells.

266.    Recent studies have established a statistically significant correlation between Defendants' Products and uterine/endometrial cancer.

267.    Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding Plaintiff and with the intention of having her act and rely on such misrepresentations and/or omissions.

268.    Defendants knew that their concealments, misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive, and deceitful when they were made. Alternatively, Defendants concealed information, and/or made the representations with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

269.    Defendants profited, significantly, from their unethical and illegal conduct that caused Plaintiff to purchase and habitually use a dangerous and defective product.

270. Defendants' actions and representations, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

271. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

      a. Economic losses including medical care and lost earnings; and

      b. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT ELEVEN – BREACH OF EXPRESS WARRANTY

272. Plaintiffs repeat and reallege the allegations in Paragraphs 1-271 above, as if fully set forth herein.

273. The Defendants expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated users.

274. The Products did not conform to these express representations because they cause serious injury when used in the manner directed by Defendants in the form of cancer, including, but not limited to, uterine/endometrial cancer.

275. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

276. Economic losses including medical care and lost earnings; and

277. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT TWELVE – BREACH OF IMPLIED WARRANTIES

278. Plaintiffs repeat and reallege the allegations in Paragraphs 1-277 above, as if fully set forth herein.

279. At the time the Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the Products, the Defendants knew of the uses for which the Products were intended and impliedly warranted the Products to be of merchantable quality and safe for such use.

280. Defendants breached their implied warranties of the Products sold to Plaintiff because they were not fit for their common, ordinary and intended uses.

281. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT THIRTEEN – NEGELIGENT FAILURE TO RECALL

282. Plaintiffs repeat and reallege the allegations in Paragraphs 1-281 above, as if fully set forth herein.

283. At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from the Products and, therefore, owed a duty of reasonable care to avoid causing harm to those who used the Products, such as Plaintiff.

284.    Defendants knew or should have known through the exercise of reasonable care, the risks to consumers posed by the Products.

285.    Defendants knew or, by the exercise of reasonable care, should have known use of the Products was harmful and had the potential to increase the risks of cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

286.    Defendants owed a duty to the users of the Products, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available the Products.

287.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

288.    As discussed, Defendants knew or reasonably should have known that the Products were dangerous and not safe for use.

289.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the Products were defective and unsafe for Plaintiff, who is a person likely to use the Products for the purpose and in the manner for which the Products were intended to be used and for purposes reasonably foreseeable to Defendants.

290. However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the Products to be used by Plaintiff without proper recall or retrofit or warning.

291. Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the Products to consumers.

292. In failing to properly recall and/or retrofit the Products, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

293. Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein.

294. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

**COUNT FOURTEEN – MEDICAL MONITORING**

295. Plaintiffs repeat and reallege the allegations in Paragraphs 1-294 above, as if fully set forth herein.

296. At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from the Products and, therefore, owed a duty of reasonable care to avoid causing harm to those who used the Products, such as Plaintiff.

297.    Defendants knew or should have known through the exercise of reasonable care, the risks to consumers posed by the Products.

298.    Defendants knew or, by the exercise of reasonable care, should have known use of the Products was harmful and had the potential to increase the risks of cancerous growths in women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine/endometrial cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

299.    Defendants owed a duty to the users of the Products, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available the Products.

300.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

301.    As discussed, Defendants knew or reasonably should have known that the Products were dangerous and not safe for use.

302.    As a direct and proximate result of Defendants' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

303.     As a direct and proximate result of Defendants' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future.

304.     Monitoring procedures exist that makes the early detection and prevention of the above EDC-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

305.     These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

306.     The injuries Defendants' Products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these Products.

307.     Plaintiff demands judgment against Defendants for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT FIFTEEN – LOSS OF CONSORTIUM

308.     Plaintiffs repeat and reallege the allegations in Paragraphs 1-307 above, as if fully set forth herein.

309. At all relevant times, Plaintiff REYNARD CRUTCHER was and is the lawfully wedded husband of Plaintiff VERONICA CRUTCHER, and as such, was and is entitled to the services, consortium and society of Plaintiff VERONICA CRUTCHER.

310. As a result of the foregoing strict products liability, negligence, and breach of warranties by the defendants, REYNARD CRUTCHER, was deprived of the services, consortium, and society of Plaintiff VERONICA CRUTCHER.

311. As a direct, proximate, and legal consequence of Defendants' wrongful conduct as described herein, whether through strict liability or negligence, Plaintiff REYNARD CRUTCHER has suffered and will continue to suffer the loss of support, companionship, service, love, affection, society, intimate relations, and other elements of consortium all to the detriment of their marital relationship for which Plaintiff REYANRD CRUTCHER is entitled to compensatory damages in an amount to be proven at trial.

312. WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and causes of action, and as follows:

1. Awarding compensatory damages in excess of $75,000, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other non-economic damages in an amount to be determined at trial of this action;

67

2. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

3. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

4. Prejudgment interest;

5. Post judgment interest;

6. Awarding Plaintiff's reasonable attorneys' fees;

7. Awarding Plaintiff the costs of these proceedings; and

8. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all claims so triable.

Dated: May 18, 2023                Respectfully submitted,

/s/ EricaRae M. Garcia
EricaRae M. Garcia (*Pro Hac Vice*)
Weitz & Luxenberg, PC
700 Broadway
New York, NY 10003
Phone: 212-558-5825
Facsimile: 646-293-4319
egarcia@weitzlux.com

*Attorney for Plaintiffs*

68